NOT DESIGNATED FOR PUBLICATION

No. 119,490

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of P.W. and C.W.,
Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN M. SMITH, judge. Opinion filed December 7, 2018. Affirmed.

*Anita Settle Kemp*, of Wichita, for appellant natural mother.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GARDNER, P.J., ATCHESON and SCHROEDER, JJ.

PER CURIAM: Mother appeals the district court's termination of her parental rights of P.W., her minor child born in 2010, and C.W., her minor child born in 2013. The district court found that Mother was unfit, that her condition was unlikely to change in the foreseeable future, and that termination was in the best interests of her children. Mother appeals arguing that the district court's finding of unfitness is not supported by clear and convincing evidence. Father's parental rights were also terminated but filed a separate appeal and does not join Mother in this appeal. Finding no error, we affirm.

*Factual Background*

In September 2016, the State filed a child in need of care (CINC) petition because P.W. was not attending school. The petition was amended in November 2016 to include

1

an additional petition regarding C.W. The district court granted temporary custody of the children to the Department for Children and Families (DCF) based on allegations of truancy, physical abuse, domestic violence, and substance abuse.

At a review hearing in December 2016, Mother and Father were required to submit to urinalysis (UA) testing. Both parents tested positive for methamphetamine and marijuana. As a result, the district court ordered Mother and Father to obtain drug and alcohol assessments.

The children were adjudicated CINC on January 11, 2017. At the hearing, both parents pled no contest to the allegations and waived their right to an evidentiary hearing. The district court found that despite reasonable efforts to facilitate a permanency plan, the parents continued to test positive for marijuana. The court ordered the children to remain in DCF custody and ordered a change of venue to Sedgwick County because the parents had moved there.

At a permanency hearing in March 2017, both parents were ordered to submit to a hair follicle test within 24 hours. But neither submitted to the test until almost two months later when both tested positive for amphetamine and methamphetamine. Over the next few months, both continued to test positive for drugs and refused to submit to several UA and hair follicle tests.

In October 2017, the State filed a motion to terminate both parents' parental rights. At the termination hearing in January 2018, the district court heard testimony from Mother, Father, the children's maternal aunt (Aunt), and Christina Somers (a licensed permanency specialist). The State also submitted 23 exhibits showing the parents' achievement plans, their substance abuse problems, and their refusal to admit drug use.

Mother testified about her living conditions, sobriety, and relationship with Father. She testified that although she had a reintegration plan, she never went to the Regional Alcohol and Drug Assessment Center to complete a drug assessment and had failed to complete any parenting classes, counseling, and some required UA's. According to Mother, after her children were placed in DCF custody, she almost immediately moved in with her mother-in-law to get "clean and sober." Yet Mother continued to test positive for marijuana, amphetamines, and methamphetamine.

Mother admitted to smoking marijuana for "[a] couple of months" but denied ever using methamphetamine. Mother testified that methamphetamine was in her system only because the baggie from which she got her marijuana probably had methamphetamine in it previously. Mother contended that her use of Ibuprofen, Naproxen, and Zantac caused her to test positive for marijuana, methamphetamine, and amphetamines. Mother also denied that her husband ever knowingly used methamphetamine. While Mother never conceded to using methamphetamine directly, she testified that if she were using, it would not affect her parenting skills.

Mother testified that she had previously expressed fear of being in her home due to arguments with Father but she refused to say that Father had hit her. The friend to which Mother had expressed these fears had taken Mother to a domestic violence shelter in October 2016. Mother admitted that she was evicted from her house for not paying rent. She told her landlord that she was unable to pay rent because she had to pay for her mother's funeral expenses. But her mother had not died and neither had incurred funeral expenses.

After failing to attend scheduled meetings, Mother took over a month to meet with her case manager to discuss her reintegration plan. Mother also waited nearly six months from the time her children had been placed in DCF custody to begin her reintegration tasks. She thought that she needed more time to complete her reintegration tasks and did

not think it would be reasonable or good for the children if they were returned to her immediately.

Mother eventually stated that she was not going to answer any more questions. As a result, the district court found that Mother was no longer available to testify and held that any statements she had made to other parties would be admissible.

Father testified next. He admitted to having used methamphetamine before the children were taken from his custody. Father testified that the restaurant he and Mother worked at was filled with workers who smoked methamphetamine together while on shift. Father testified that he and Mother were taking part in a parenting class and had completed the course. Father also testified that he and Mother were attending family counseling with a therapist, but Father failed to provide DCF with proof of the classes and therapy sessions. Father also admitted that he had not yet acknowledged his drug use issues with the therapist and had recently failed a hair follicle test.

The children's maternal aunt testified next. She had been raising the children in her home since June 10, 2017. Although there was an adjustment period, Aunt testified that both children were doing well in her care. Both were also doing well in school and P.W. was in therapy. While the children were in Aunt's care, Mother and Father were ordered to contact their children only over the phone and at the children's request. Before that court order went into effect, Aunt recalled one or two in-person visits Mother had with C.W. but P.W. had refused to attend. After the order went into effect, the children had no visitation with their parents and requested only one phone call with them on Christmas. That Christmas phone call was, however, cut short when the parents made several false promises which caused P.W. great distress. Aunt testified that almost any interaction with the parents consistently caused P.W. sadness and frustration.

4

Somers, a permanency specialist, testified next. She said the CINC proceedings began based on truancy concerns for P.W. and then the case progressed with concerns of substance abuse, homelessness, and physical abuse between the parents. P.W. had alleged that Mother and Father had used "gray tape" on her and C.W. and had physically abused them, but that claim was never substantiated.

Somers testified regarding her interactions with Mother. On one occasion, Mother yelled at Somers as she tried to go over her reintegration plan. Mother claimed that Somers was failing to do her job and that she had already completed the necessary tasks. Somers, however, did not believe that Mother had completed even a single task in her reintegration plan. Somers explained that Mother had failed to attend several meetings with her, some of which she had not canceled before failing to show. In April 2017, Somers finally met with both parents, discussed their achievement plan in detail, and gave the couple a copy of the plan. She told the parents that they needed to complete a couple of court orders, including a drug assessment and drug testing, but the parents refused to sign the plan and failed to follow the court orders.

Somers' gravest concerns included P.W.'s refusal to visit with the parents, and the parent's drug use. Mother and Father eventually submitted hair follicle tests which were positive for methamphetamine and amphetamines, and both parents continued to test positive for methamphetamine and marijuana in the following months. Out of the ten times Mother and Father were requested to complete UA's, they completed only two.

After considering changing circumstances, including Mother's place of work, Somers organized three different achievement plans for the parents. The plans were also amended because Mother and Father were failing to complete almost any of the plan tasks. Eventually both Mother and Father completed some tasks, including the following: getting a SACK assessment, gaining employment, showing proof of a lease agreement, getting water and gas turned on, and completing clinicals. Still, Mother and Father failed

5

UA's after treatment and Mother tested positive for methamphetamine and amphetamines while still in treatment. Both were asked to reenter substance abuse treatment but refused. Mother and Father also failed to take parenting and anger management classes as required.

As of November 2017, the plan for P.W. and C.W. was changed from reintegration with Mother and Father to adoption. Somers agreed with this change because Mother and Father continued to abuse drugs and made little progress toward reintegration. Somers was concerned with Mother's refusal to admit using drugs or to accept blame for the children's circumstances. Somers also worried that C.W. no longer had a parent-child relationship with Mother and Father. C.W. had even concocted a story that Mother had died in a tornado and started calling the parents by their first names instead of mom and dad.

Somers concluded that she did not think the children were safe in Mother and Father's care and that she did not see the parents changing in the foreseeable future. Somers thought it would be in the children's best interest to terminate both parents' parental rights.

After considering the evidence presented, the district court found both parents unfit by reason of conduct or condition which rendered them unable to properly care for their children and the conduct or condition was unlikely to change in the foreseeable future. The district court also considered the physical, mental, and emotional health of the children, contemplated the foreseeable future viewed through "child time," and determined that termination of parental rights was in the best interest of the children. Mother timely appeals.

*Governing Legal Principles*

We begin with some general principles governing proceedings under the Revised Kansas Code for Care of Children, K.S.A. 20017 Supp. 38-2201 et seq. A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 759-60, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the right has been deemed fundamental. Accordingly, the State may extinguish the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2017 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

As provided in K.S.A. 2016 Supp. 38-2269(a), the State must prove the parent to be unfit "by reason of conduct or condition" making him or her "unable to care properly for a child" and that the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in combination would amount to unfitness. K.S.A. 2017 Supp. 38-2269(b). And the statute lists four other factors to be considered if a parent no longer has physical custody of a child. K.S.A. 2017 Supp. 38-2269(c). In addition, the State may rely on 1 or more of 13 statutory presumptions of unfitness outlined in K.S.A. 2017 Supp. 38-2271.

In reviewing a district court's determination of unfitness, an appellate court must be convinced, based on the full evidentiary record considered in a light favoring the State as the prevailing party, that a rational fact-finder could have found that decision "highly probable, *i.e*., [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705. The appellate court cannot weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. In short, any conflicts in evidence must be resolved to the State's benefit.

7

Having found unfitness, the district court must then determine whether termination of parental rights is "in the best interests of the child." K.S.A. 2017 Supp. 38-2269(g). The district court makes that determination based on a preponderance of the evidence. *In re R.S.*, 50 Kan. App. 2d at 1116. The best-interests issue is essentially entrusted to the district court acting within its sound judicial discretion. 50 Kan. App. 2d at 1115-16. An appellate court reviews those sorts of decisions for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

*Clear and convincing evidence supports the district court's decision to terminate Mother's parental rights.*

Mother contends that the district court's finding that she was unfit and that her unfitness was unlikely to change in the foreseeable future was not supported by sufficient evidence.

The district court found five statutory factors had established Mother's unfitness:

K.S.A. 2017 Supp. 38-2269(b)(3) — "the use of intoxicating liquors or narcotics or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child."

K.S.A. 2017 Supp. 38-2269(b)(7) — "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family."

K.S.A. 2017 Supp. 38-2269(b)(8) — "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child."

8

K.S.A. 2017 Supp. 38-2269(c)(2) — "failure to maintain regular visitation, contact or communication with the child or with the custodian of the child."

K.S.A. 2017 Supp. 38-2269(c)(3) — "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home."

Mother contests only two of these factors—the first and the third.

Mother fails to brief any issues regarding the three remaining factors. Yet any one of those factors, alone, would be sufficient to establish unfitness. K.S.A. 2017 Supp. 38-2269(f). By not briefing any claim of error, Mother has waived or abandoned any challenge to the court's finding that those three factors were met. See *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018). So we need not reach Mother's arguments about the first and third factors.

We do so, however, in an abundance of caution. Mother first argues that the district court erred in finding that her use of intoxicating drugs was unlikely to change in the foreseeable future. Mother asserts that she was sober from May 19, 2017, to September 27, 2017. Mother also argues that the State failed to prove that any nexus exists between a person's use of an intoxicating substance and impaired parenting skills.

The district court found that Mother's hair follicle and UA test results, combined with Mother's refusal to submit to several court ordered tests, evidenced Mother's past and continued use of methamphetamine and marijuana. The district court was greatly concerned by Mother's refusal to acknowledge her drug use. Still, the district court found that its "greatest concern comes from [Mother], her actual statement that she believes that an active meth user can adequately care for children. That . . . is absolutely an indicator that if . . . she gets an opportunity to care for these kids and use methamphetamine and drugs, she will do it."

9

Although Mother consistently denied using anything but marijuana, the record shows Mother's past and continued use of methamphetamine, amphetamines, and marijuana. The district court found Mother's testimony lacked credibility, and we cannot revisit that finding.

Mother contends no causal nexus was shown between her drug use and her parenting skills. Although the record may not show direct evidence of how Mother's drug use affects her children, the State is not required to prove by direct evidence that Mother's conduct was due to her drug use. Any material facts may be proved by direct testimony, by indirect or circumstantial evidence, or by a combination of both. See *State v. Tillery*, 227 Kan. 342, 346, 606 P.2d 1031 (1980); *State v. Higdon*, 224 Kan. 720, 723, 585 P.2d 1048 (1978). No exclusive mode of proof of the factors supporting termination is prescribed by law. In *In re C.A.G.-V.*, No. 113,334, 2015 WL 5224828 (Kan. App. 2015) (unpublished opinion), we found: "While there may not be direct evidence that Father's drug use was in and of itself harmful to C.A.G.-V., there is clear and convincing evidence that Father's failure to acknowledge his drug issues created a significant impediment towards reintegration." 2015 WL 5224828, at *4. The same is true here.

The record contains circumstantial evidence that Mother's drug use and failure to acknowledge her drug issues created a significant impediment towards reintegration. Somers testified that parents were required to have a negative hair follicle test before DCF workers could enter the home to check it for suitability. Because Mother failed to meet that requirement, DCF workers were unable to check the home for suitable living conditions. The children cannot return to the home until Mother's house is deemed suitable. Mother's refusal to acknowledge her drug use has resulted in Mother's failure to address her substance abuse in any meaningful way. Mother required additional substance abuse treatment as a result of continued failed UA's and her refusal to acknowledge her drug problems. And Mother's failure to complete her reintegration tasks caused P.W. great emotional distress. As such, we find that Mother's drug usage impacted

10

her ability to parent and that she was unwilling to change her circumstances in order to meet her children's needs.

We find clear and convincing evidence that Mother's use of narcotics or dangerous drugs was of such duration or nature as to render her unable to care for the ongoing physical, mental or emotional needs of her children. The district court's reliance on K.S.A. 2017 Supp. 38-2269(b)(3) was proper.

Next Mother argues that the district court erred in finding that she showed a lack of effort to adjust her circumstances. K.S.A. 2017 Supp. 38-2269(b)(8). She contends that she made some progress toward reintegration, so cannot be found to have lacked effort. The record confirms that Mother completed some of her tasks but failed to complete the majority of her case plan tasks. And the fact that Mother completed some tasks does not prove that Mother would continue to complete her reintegration tasks or ever successfully complete a reintegration plan.

It is true that Mother received a clinical assessment, went to out-patient treatment, and provided DCF with a housing lease. However, Mother failed to attend anger management or parenting classes, continued using drugs, failed to admit to her drug usage, and refused to attend further treatment for her substance abuse. Somers found Mother and Father's refusal to admit to using drugs to be "a huge barrier . . . . We can't move forward unless they admit there is an issue, they need help." Relatedly, Mother never accepted blame for the initiation of the CINC proceedings. When asked why she needed more time to complete her tasks, she stated "[t]o become the parent I should be, that I need to be." Still, Mother could not detail why she was not the parent she needed to be and continued to deny ever using methamphetamine. These children "'should not have to endure the inevitable to [their] great detriment and harm in order to give the mother an opportunity to prove her suitability.'" *In re Price*, 7 Kan. App. 2d 477, 480, 644 P.2d 467 (1982) quoting *In re East*, 32 Ohio Misc. 65, 69, 288 N.E.2d 343 [1972]).

11

Lastly, Mother contends she could not be found to be unfit in the foreseeable future because the progress she achieved toward reintegration indicates that her progress would continue into the future.

We examine the "foreseeable future" from the perspective of a child. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Children and adults have different perceptions of time, and a child has the right to permanency within a time frame that is reasonable to them. 50 Kan. App. 2d at 1170. A district court may look to a parent's past conduct as an indicator of future behavior. See *In re Price*, 7 Kan. App. 2d at 483; *In re M.T.S.*, No. 112,776, 2015 WL 2343435, at *8 (Kan. App. 2015) (unpublished opinion). P.W. and C.W. are now eight years old and five years old. By the date of the termination hearing the children had been in DCF custody for 14 months. And Mother admitted that she waited six months before even beginning her reintegration tasks. While these time frames may appear insignificant to Mother, they are a significant amount of time to children.

As noted above, the record does not support Mother's view of her progress toward reintegration. We find no error in the district court's finding that Mother is unfit and unlikely to change in the foreseeable future.

*Conclusion*

Having reviewed the record, we agree that Mother's consistent drug use and lack of effort to adjust her circumstances warranted termination of her parental rights. We are convinced that a rational fact-finder would have found it highly probable that Mother is unfit and that her unfitness is unlikely to change in the foreseeable future. The district court did not abuse its discretion in finding that termination of parental rights is in the children's best interests. Accordingly, we affirm.

12